AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



LODGED
CLERK, U.S. DISTRICT COURT
7/24/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___RAM___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
7/24/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KC___ DEPUTY

for the

Central District of California

UNITED STATES OF AMERICA,

v.

Jaylen SIMMONS-BORDERS,

Defendant.

Case No. 5:23-MJ-00362-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 17, 2023 in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | See attached affidavit |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

ATF Special Agent Joseph Nazareno
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: July 24, 2023

Judge's signature

City and state: Riverside, California

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (951-276-6246)

**AFFIDAVIT**

I, Joseph Nazareno, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Jaylen SIMMONS-BORDERS ("SIMMONS-BORDERS") for a violation of 18 U.S.C. § 922(o), Possession of a Machinegun, on March 17, 2023.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

1. I am a Criminal Investigator, Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since January 2017. I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), as such, I am empowered by law to conduct investigations and make arrests for the offenses enumerated within the United States Code.

2.      Prior to working for the ATF, I was employed as a United States Probation & Pretrial Services Officer in the Eastern District of Wisconsin (Milwaukee) for two years. In that capacity, I supervised individuals alleged to have committed federal crimes, and those convicted of violating federal law, including offenses related to firearms, controlled substances, financial fraud, and sexually based crimes. I also worked as a United States Probation Officer in the Western District of Tennessee (Memphis) for four years as a presentence investigator and as a supervision officer. During this time in Memphis, I also served as a certified Firearms Instructor, a Defensive Tactics Instructor, and a Search Enforcement Team member.

3.      I have received a Bachelor of Arts degree in Psychology from the University of Dallas, and a Master of Arts degree in Forensic Psychology from the Chicago School of Professional Psychology.

4.      I am currently assigned to the ATF Riverside Field Office in Riverside, California, where I conduct proactive criminal investigations, participate in the execution of arrest and search warrants, conduct Federal, State, and County undercover operations, and manage collateral duties within the office.

5.      I am also assigned as a Tactical Medic wherein I provide medical support to the ATF Special Response Teams, National Response Teams, the Los Angeles Field Division. I also provide instruction and training at the Federal Law Enforcement Training Center, the Los Angeles Field Division, and other ATF

Field Divisions in the United States, and U.S. territories including Guam and Saipan.

### III. STATEMENT OF PROBABLE CAUSE

3. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.  March 17, 2023, Undercover Controlled Purchase #1**

4. In or around 2022, deputies from the Riverside County Sheriff's Office – Gang Task Force – Region VI ("RSO GTF") provided information to an undercover ATF Special Agent ("UC-1") about SIMMONS-BORDERS using a particular Instagram account to sell firearms.[1]  Following the tip, UC-1 contacted SIMMONS-BORDERS on Instagram to arrange controlled firearm purchases.

5. On or about March 12, 2023, at approximately 10:30 p.m., SIMMONS-BORDERS sent UC-1 three photographs through the Instagram messaging platform.  Each photograph depicted weapons consistent with those I recognize as being a revolver, a Glock handgun with a large-capacity magazine, and another Glock handgun with a large-capacity magazine.  In each photograph, there were numbers under each firearm.  In this context, I understood that the numbers in each photograph corresponded to the amount of money for which each firearm was being sold, i.e., $700, $1,000, and $1,200.  Shortly after SIMMONS-BORDERS sent

---

[1] The tip from RSO GTF mentioned SIMMONS-BORDERS by name. Following the controlled firearm purchases referenced in this affidavit, ATF agents obtained SIMMONS-BORDERS's California driver's license photo from the DMV and confirmed that SIMMONS-BORDERS was the person who arrived and sold firearms to UCs following the deals arranged using that Instagram account.

3

the direct messages of the firearms, SIMMONS-BORDERS advised he would "unsend" the messages, i.e., delete/erase the communications so they could no longer be viewed.

6. On or about March 17, 2023, at approximately 12:02 a.m., SIMMONS-BORDERS provided UC-1 his personal phone number. UC-1 contacted SIMMONS-BORDERS via text message utilizing an undercover monitored phone line. UC-1 and SIMMONS-BORDERS agreed that SIMMONS-BORDERS would sell UC-1 firearms at a Baker's Drive-Thru Restaurant in Riverside, California.

7. The same morning, beginning at approximately 9:44 a.m., UC-1 contacted SIMMONS-BORDERS on his phone number to determine his whereabouts. At approximately 10:18 a.m., UC-1 spoke to SIMMONS-BORDERS on the phone. SIMMONS-BORDERS advised he overslept due to drug use and would be traveling from the San Bernardino area to complete the controlled purchase later the same afternoon.

8. At approximately 10:53 a.m., UC-1 arrived at the meeting location in Riverside and parked. From that time, to approximately 11:16 a.m., UC-1 contacted SIMMONS-BORDERS at his phone number multiple times to determine his whereabouts. UC-1 requested he send a photograph of the items being purchased. At approximately 11:00 a.m., SIMMONS-BORDERS sent a timed-disappearing message in the Instagram messaging platform. UC-1 observed a Taurus revolver. I recognized this revolver as being similar to the revolver sent through the Instagram messaging platform on or about March 12, 2023.

6. Ultimately, UC-1 met with SIMMONS-BORDERS at the Bakers Drive-Thru in Riverside, and SIMMONS-BORDERS sold UC-1 one Glock handgun with a machinegun switch[2] attached, one Taurus revolver, ammunition, and firearm accessories. Both firearms were loaded and chambered, ready to be fired.

7. I noted that the aforementioned firearms matched the physical descriptions and characteristics of those previously sent by SIMMONS-BORDERS to UC-1 through the Instagram messaging platform. Based on my training and experience, I believe that the firearms were loaded/chambered in that way in order to make robbing UC-1 easier if SIMMONS-BORDERS saw an opportunity to do so. I have been involved in numerous controlled firearm purchases in my career, and sellers rarely sell firearms with ammunition loaded into the firearm and chambered, even when they sell firearms and ammunition together. Robberies during illicit firearm and drug purchases are fairly common since they are usually conducted in cash and the robber believes that the victim will be unlikely to seek help from law enforcement since doing so would entail revealing the victim's own illegal activity.

8. Also, I noted that during the controlled purchase, SIMMONS-BORDERS arrived at the meeting location with at least one other person in his vehicle. Based on my training and

---

[2] A "machinegun switch" in this context is a conversion device that allows a semiautomatic Glock-style handgun to fire more than one shot automatically with a single pull of the trigger. The machinegun switches themselves are defined as "machineguns" under 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b).

5

experience, I believe that the other individual accompanying SIMMONS-BORDERS acted as a lookout and could have acted as extra help if a robbery were to take place.

### B.   May 23, 2023, Undercover Controlled Purchase #2

9.   After March 17, 2023, SIMMONS-BORDERS maintained communications with UC-1 utilizing his phone number.

10.   On or about March 18, 2023, SIMMONS-BORDERS sent UC-1 a photograph of a handgun available for sale.  The same day, UC-1 informed SIMMONS-BORDERS that the firearms intended to be purchased would be exported overseas.  SIMMONS-BORDERS texted, "An [sic] yea I'm understanding now."

11.   Between on or about March 19, 2023, to March 20, 2023, SIMMONS-BORDERS informed UC-1 of the following:

   a.   SIMMONS-BORDERS had two handguns with a machinegun switches attached available for purchase;

   b.   SIMMONS-BORDERS quoted the price of each machinegun switch at $100 each; and

   c.   SIMMONS-BORDERS offered an FN57 handgun for purchase.

12.   On or about March 21, 2023, SIMMONS-BORDERS sent UC-1 a photograph of an FN57 handgun available for sale.  Later the same day, SIMMONS-BORDERS confirmed that he would facilitate the sale of three handguns and five machinegun switches for $4,500.

13.   On or about March 22, 2023, SIMMONS-BORDERS advised that one of the handguns available for purchase was no longer available because his "cousin" did not want to sell the handgun. SIMMONS-BORDERS offered to sell UC-1 a different model handgun

6

as a replacement. Later the same evening, SIMMONS-BORDERS advised he would have two handguns and five machinegun switches available for $3,100.

14. At approximately 8:41 p.m., the same evening, SIMMONS-BORDERS advised that he was not able to send photographs via text message and would send photographs using the Instagram direct messaging platform. Between approximately 8:42 p.m. to 8:45 p.m., SIMMONS-BORDERS sent multiple photographs through the Instagram messaging platform with firearms available for purchase. After sending, SIMMONS-BORDERS instructed UC-1 to take screenshots of the photographs, and shortly thereafter, the messages were erased by SIMMONS-BORDERS in the direct messaging platform.

15. On or about March 23, 2023, at approximately 10:06 a.m., SIMMONS-BORDERS attempted to call UC-1 through the Instagram messaging platform and advised, "My phone is off if you where [sic] calling me." As such, UC-1 communicated with SIMMONS-BORDERS through Instagram, and he advised that he was "waiting on [his] boy with the switches." Ultimately, SIMMONS-BORDERS and UC-1 agreed to complete the sale at the same Bakers Drive-Thru in Riverside.

16. Later the same day, beginning at approximately 12:37 p.m., and ending at approximately 12:50 p.m., UC-1 and an additional ATF undercover Special Agent ("UC-2") completed the controlled purchase of two loaded Glock handguns, ammunition, and firearm magazines from SIMMONS-BORDERS at the Bakers Drive-Thru in Riverside. One of the Glock handguns was loaded and

chambered, ready to be fired. Based on my training and experience, I believe that the firearms were loaded/chambered in that way to make robbing the UCs easier. Also, I noted that during the controlled purchase, SIMMONS-BORDERS arrived at the meeting location with at least one other person in his vehicle. Based on my training and experience, I believe that the other individual accompanying SIMMONS-BORDERS acted as a lookout and could have acted as extra help if a robbery were to take place.

17. At the direction of ATF management, I have suspended any future controlled purchases due to the safety of the UCs based on the risk of SIMMONS-BORDERS robbing the UCs.

**C. Additional Gun Sale Messages**

18. At approximately 12:50 p.m., immediately after the March 23 purchase, SIMMONS-BORDERS called UC-1 and advised he had two additional handguns available for purchase the same day. Later the same afternoon, at approximately 4:31 p.m., SIMMONS-BORDERS offered to sell the FN57 handgun, and asked whether UC-1 would return to purchase the machinegun switches.

19. On April 1, 2023, SIMMONS-BORDERS sent UC-1 a text message and stated that he had a handgun for sale.

20. On April 5, 2023, SIMMONS-BORDERS sent UC-1 a text message and stated that he had a handgun and at least two machinegun switches for sale.

21. On April 30, 2023, SIMMONS-BORDERS sent UC-1 a text message and photographs and stated that he had a fully-automatic AR-type pistols available for purchase.

8

22. On or about May 26, 2023, officers from the Palm Springs Police Department, with assistance from the FBI, conducted a traffic stop on SIMMONS-BORDERS in Palm Springs, California. Officers recovered a firearm from the vehicle, impounded the vehicle, and seized the cellphone he had on his person.

23. On or about June 6, 2023, UC-1 contacted SIMMONS-BORDERS through Instagram. SIMMONS-BORDERS explained he had been arrested and his cellphone seized. SIMMONS-BORDERS provided a new phone number.

24. On or about July 10, 2023, UC-1 contacted SIMMONS-BORDERS at the cellphone number provided on June 6, 2023. After not receiving any response, UC-1 contacted SIMMONS-BORDERS on Instagram. SIMMONS-BORDERS advised that he had a new phone number.

25. On or about July 11, 2023, UC-1 called SIMMONS-BORDERS. During the phone call, SIMMONS-BORDERS advised that he had machinegun switches available for purchase and that he would send photographs of other firearms he would have available in the coming weeks.

26. On or about July 17, 2023, SIMMONS-BORDERS called UC-1 and told UC-1 that SIMMONS-BORDERS could obtain machinegun switches for handguns as well as auto-sears for AR-type rifles.[3]

27. On or about July 22 through July 23, 2023, SIMMONS-BORDERS contacted UC-1. He sent UC-1 a photograph of a Polymer 80 Glock-style ghost gun with a threaded barrel typically used

---

[3] Auto-sears are machinegun conversion devices for rifles.

9

to accept a silencer. He also informed UC-1 that he had five machinegun switches, a Glock Model 27 with a machinegun switch attached, and one fully-automatic AR-type rifle for sale.

### D. ATF Firearms Technology Criminal Branch ("FTCB") Findings

28. I sent the Glock handgun with attached machinegun switch to FTCB following the March 17, 2023, controlled purchase. On March 30, 2023, FTCB received the handgun. A Firearms Enforcement Officer then examined the handgun and conducted tests on the handgun.

29. On April 4, 2023, the FTCB determined the firearm to be a machinegun as defined by 26 U.S.C. § 5845(b) and 18 U.S.C. § 924(a)(24).

## IV. CONCLUSION

30. For all of the reasons described above, there is probable cause to believe that SIMMONS-BORDERS has committed a violation of 18 U.S.C. § 922(o), Possession of a Machinegun, on March 17, 2023.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __24th__ day of
July 2023.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE